(8 Misc. Rep. 379.)

FROHMAN v. MILLER et al.

(Superior Court of New York City, Special Term. May, 1894.)

1. TRADE-MARKS—INFRINGEMENT.
　　The trade-mark acquired in connection with the title "Charley's Aunt," given to plaintiff's play, is not infringed by the title "Charley's Uncle," given to defendant's play.
2. SAME—ADVERTISING DEVICES.
　　Posters used in advertising defendant's play, entitled "Charley's Uncle," though in the same style as the posters advertising plaintiff's play, entitled "Charley's Aunt," are not so similar thereto as will entitle plaintiff to an injunction against their use, where plaintiff's posters bore device of a laughing cat, and defendant's posters bore the device of an owl.

Action by Charles Frohman against Arthur E. Miller and others. Plaintiff moves for an injunction against the production by defendants of a play called "Charley's Uncle," and from using certain advertising devices in relation thereto. Denied.

W. M. Rosebault, for the motion.
Vanderpoel, Cumming & Goodwin, opposed.

McADAM, J. The plaintiff, a theatrical manager, acquired, by permission from the author, the exclusive right for three years to the production, within the United States and Canada, of a play entitled "Charley's Aunt." The play has been produced upon the London stage, and has had a successful run in the city of New York since October 3, 1893, during which time the plaintiff has expended a very large sum in advertising the play; and in calling the attention of the public to it he has used the odd and attractive picture of a laughing cat, probably intending to indicate thereby that the play was funny enough to make a cat laugh. The plaintiff complains that the defendants, who are also dramatic managers, intend to produce at the Bijou Theater, in this city, on the 7th inst.,. a play entitled "Charley's Uncle," and that they have advertised the same by means of posters and display sheets in imitation of the manner and style in which "Charley's Aunt" has been advertised, with the difference only that, in place of a cat, the defendants have inserted an owl; also, that the title "Charley's Uncle" was deliberately and intentionally assumed for the purpose of imitating the title of "Charley's Aunt," and the trade-mark acquired in connection therewith; that the play now called by the defendants "Charley's Uncle" did not originally possess that title, but was known by the name of "A Noble Art" or "The Noble Art;" that it was produced by that name in London, where it was pronounced of little merit or value. There is no pretense that the defendants have used the plot, characters, words, music, scenic effects, or theatrical paraphernalia of "Charley's Aunt," and the claim for injunctive relief is based entirely upon the alleged similarity of title and of advertising posters. While there is no doubt as to the power of the court to enjoin the use of a title calculated to deceive the public into the belief that the defendants were performing the plaintiff's play, the question is whether the title "Charley's Uncle" is so similar to "Charley's Aunt" as to induce the public to take the former for the latter. It is not alleged that the plaintiff has copyrighted the title "Charley's Aunt," and his right to the use of the name is founded on the fact that the author, who is entitled to protection in his literary efforts, has designated his production by that name; so that his right to use it in connection with the production has, without copyright, substantially the same protection as the play itself. Therefore, whether copyrighted or not, the author's right to the title of his attraction is to be protected from unlawful invasion. Thus, the name of the play known as "The Two Orphans" was protected by injunction, and the proprietor of a Philadelphia theater was enjoined from permitting the performance of another

play under the title of "Les Deux Orphelines, or, The Two Orphans," under both the French and English titles.   The court in that case said:

"If it was not the defendant's intention to produce the plaintiffs' play, the effect of it was to mislead the public, and thereby injure the plaintiffs in their future business."   Shook v. Wood, 32 Leg. Int. 264.

In an action brought in this court to restrain the performance of a play called "Charity," the court declined to enjoin the defendant from using another play under the same title, there being no question of similitude or imitation in the subject-matter of the plays. The court said:

"Charity is a virtue that has been symbolized and portrayed in every stage and department of art for all ages;"

—and that the use of the word as a designation for any work of art or literature could not be monopolized by any one person. Isaacs v. Daly, 39 N. Y. Super. Ct. 511.   The court remarked:

"There may be occasions when a title is made use of in bad faith, or to promote some imposition, or to inflict a wrong, when a court of justice should interfere to prevent its use, or to compensate a party who has in consequence sustained an injury.   But the present case does not appear to be one where the court is called upon to interfere for any of these reasons."

But there the title of both plays was precisely the same; in this instance they are dissimilar, the one portraying Charley's aunt,—a female,—while the other portrays his uncle,—a male.

It cannot be urged that the plaintiff, even if he had copyrighted the title "Charley's Aunt," could have extended his right to literary protection to all the relatives of Charley's family; for it must have been known to the plaintiff that this Charley, like every other individual, was apt not only to have aunts, but uncles, brothers, sisters, cousins, and, perhaps, a mother-in-law and a grandfather.   Nor would it be seriously contended that, by adopting "Charley's Aunt" as the title to his play, he monopolized the right to all the other relatives.   It may be, and likely is, that the defendants, appreciating the great success of "Charley's Aunt," had the idea that other members of Charley's family might be equally popular with the public, and hence adopted the name of "Charley's Uncle," that they might gain a part of the popularity that the aunt had enjoyed.   It may also be true that, by putting "Charley's Uncle" before the public, the public will tire of Charley's family, and, their claim to favor thus running to ground, the plaintiff may be injured.   But that is one of the risks that every author must take, and for which he may be without a remedy.   There are many cases in the books where persons who have built up a reputation in one business have been materially injured by others of a similar name engaging in the same business, and yet the courts have never been able to furnish any suitable remedy.   Meneely v. Meneely, 62 N. Y. 427;   Scott Stamp & Coin Co. v. J. W. Scott Co. (Super. N. Y.) 15 N. Y. Supp. 325.   The courts, in these and similar cases, announced the rule that there must be no simulation of the goods, in packages or otherwise, that

those sold by the defendant should be passed off for those manufactured by the plaintiff, and that there should be no artifice used in advertising, whereby the goods of the one might be taken for those of the other.

And this leads us to the question whether the defendants' posters are so similar to those used by the plaintiff as to deceive the public. Defendants have used an owl, winking its right eye. It is a serious looking old bird, without a smile, and with an apparent incapacity to laugh. It in no manner resembles a cat, and no person, whether intelligent or otherwise, would ever mistake it for a cat. Assuming, therefore, that the plaintiff had the right to monopolize the use of a laughing cat as his trade-mark for advertising purposes, it is clear that this right does not extend to an animal so dissimilar as an owl, from which a laugh could not be provoked. The owl is typical of gravity and wisdom,—the antithesis of a laughing cat. There is no pretense that either play enriches our literature, or that either is calculated to furnish the theater-goer with anything but an alternate wise complacency and smile, as portrayed in the pictures of the owl and the cat respectively. But there is no such similitude between the owl and the cat as to warrant an injunction. If the court were to enjoin the owl from appearing on the defendants' posters, it would be hard to imagine any bird that might not with equal propriety be excluded therefrom,—even the American eagle, the bird that typifies our country. The cases relied on by the plaintiff, in which similarity of names was protected, relate to literary productions in the form of books and newspapers, or to articles like soaps, medicines, tobacco, where there was a general similitude, and where, by the general appearance and makeup, the one might be readily passed off upon the public as the other, for which reason these cases are inapplicable. It would not be seriously asserted that if the plaintiff had written a book called "Charley's Aunt," and had copyrighted the title, and put upon the outside of his work a laughing cat, the defendants would be enjoined from publishing an entirely different book entitled "Charley's Uncle," with an owl or an American eagle on the title-page. If such relief could be granted, then the defendants would have no right to publish a book, no matter how dissimilar, if entitled "Charley's Uncle," "Charley's Mother-in-Law," or Charley's relative of any kind. The case is close and near the border line, but is sufficiently removed from it to prevent interference. If any possible damage can come to the plaintiff by similarity of posters, it is so slight and inconsequential as to justify declining injunctive relief. Lewis v. Fullarton, 2 Beav. 11; Mawman v. Tegg, 2 Russ. 394; Bruce v. Canal Co., 19 Barb. 379; American Grocer Pub. Ass'n v. Grocer Pub. Co, 51 How. Pr. 406. It is a known fact that, after the great success which followed the play called "Our American Cousin," several other plays came into existence, known as "Our German Cousin," "Our African Cousin," etc., but none was considered sufficiently serious to warrant an application to a court of equity. Upon the entire case, therefore, the application for an injunction must be denied, without prejudice to any further applica-

tion the plaintiff may make, or action he may bring, if the defendants infringe upon or make use of the laughing cat or any of the peculiar features of "Charley's Aunt" which have made it popular.   Application denied.